# EXHIBIT 3 TO REQUEST FOR JUDICIAL NOTICE

# ADVERSARY PROCEEDING 20-01022

Case 20-01022 Doc 12-3 Filed 04/22/20 Entered 04/22/20 16:53:02 Exhibit 3 - Assignment of Motion Picture Assets dated August 28    2014 Page 2 of 31

3

## LOAN WORKOUT AGREEMENT

This Loan Workout Agreement ("**Agreement**") is made and entered into as of this 28th day of August 2014 ("**Effective Date**"), by and between: (i) PALM FINANCE CORPORATION, a California corporation ("**Palm**"); (ii) SEVEN ARTS ENTERTAINMENT, INC., a Nevada corporation ("**SAE**") and (iii) SEVEN ARTS FILMED ENTERTAINMENT LOUISIANA, LLC, a Louisiana limited liability company ("**SAFELA**"), with reference to the following:

### RECITALS

The following provisions form the basis for, and are hereby made part of, this Agreement:

A.    SAE is the Guarantor of a loan made by Palm to Pool Boy the Movie, LLC and Autopsy, LLC ( collectively "**Autopsy Borrowers**") pursuant to a Loan Agreement dated as of May 7, 2007 pursuant to which Palm agreed to make a loan to Autopsy Borrowers in the maximum principal amount of $5,500,000 ("**Autopsy Loan**") in connection with the production of two feature films currently entitled "American Summer" [formerly known as "**Pool Boy**"] and "Mercy" [sometimes referred to as "**Autopsy**"] ( collectively "**Autopsy Films**").

B.    The balance owed pursuant to the Autopsy Loan as of August 15, 2014 is $7,953,600.27, with interest accruing thereafter at the per diem rate of $3,922.32, and that the balance of the Autopsy Loan owed to Palm that was guaranteed by SAE as of August 15, 2014 is $5,029,987.97.

C.    SAE is the guarantor of a loan made to Gone to Hell Limited ("**9MD Borrower**") pursuant to a Loan Agreement dated as of December 17, 2007 pursuant to which Palm agreed to make a loan to 9MD Borrower in the maximum principal amount of $4,000,000 ("**9MD Loan**") in connection with the production of a feature film currently entitled "Nine Miles Down" ("**9MD Film**").

D.    The balance owed pursuant to the 9MD Loan as of August 15, 2014 is $5,024,489.31, with interest accruing thereafter at the per diem rate of $2,477.83 and that the balance of the 9MD Loan owed by SAE as of August 15, 2014 is $3,105,251.01.

E.    On or about June 11, 2010, SAE and Seven Arts Pictures, plc, entered into an Asset Transfer Agreement pursuant to which assets owned by Seven Arts Pictures, plc, were to be assigned to SAE, which was subsequently modified by the Amendment to Transfer Agreement dated January 27, 2011 and the Second Amendment to Transfer Agreement dated August 31, 2011 (collectively "**Asset Transfer Agreement**").  Pursuant to the Asset Transfer Agreement, SAE agreed in writing to guaranty the Autopsy Loan and the 9MD Loan.

F.    On October 28, 2011, Palm, SAE and SAFELA, among other parties, entered into Forbearance and Workout Agreement #6 ("**Forbearance Agreement #6**").

G.    On or about July 17, 2014, SAE and Sanwire Corporation entered into the Stock Purchase Agreement.

LOAN WORKOUT AGREEMENT - 1

## AGREEMENT

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, Palm, SAE and SAFELA agree as follows:

1.      **Assignment of Interests in Certain Movie Properties.** SAE shall assign to Palm or its designee all of its right, title and interest in all Movie Properties in which SAE has a direct or indirect interest and that certain Multi-Picture Distribution Agreement dated as of October 1, 2013 between SAFELA and SAE pursuant to the form of Assignment Agreement attached to this Agreement as Exhibit 1.

2.      **Convertible Note and Pledge Agreement.** SAE and SAFELA shall cause a Convertible Promissory Note and Pledge Agreement to be issued to Palm, in the forms attached to this Agreement as Exhibits 2 and 3 or as otherwise acceptable to Palm, in the principal amount of $950,000. The terms of the Convertible Promissory Note and Pledge Agreement shall be at least as favorable to Palm as the Convertible Promissory Note and Pledge Agreement that will be issued to Peter Hoffman.

3.      **Forgiveness of Obligations of SAE.** Upon the receipt of the Assignment Agreement, Convertible Promissory Note and Pledge Agreement, Palm shall release SAE from any further liability to Palm based on its guaranty of amounts owed by SAE pursuant to the Autopsy Loan and the 9MD Loan. The release of SAE from its obligations for payment of the Autopsy Loan and the 9MD Loan shall not alter or otherwise modify the obligations of any other party to pay the Autopsy Loan and the 9MD Loan.

4.      **Other Liability of SAE and SAFELA to Palm.** Palm acknowledges that as a result of the forgiveness of the obligations of SAE to Palm for the Autopsy Loan and the 9MD Loan that SAE and SAFELA will have no obligation to pay any other loan made by Palm.

5.      **Transfer of SAFELA's Interest in 807 Esplanade Ave. MT, LLC to Palm.** SAFELA is currently the owner of a 2.5% membership interest in 807 Esplanade Ave. MT, LLC ("MT"). SAFELA shall assign all of all of its membership interest in MT, to Palm in a form of written agreement acceptable to Palm attached as Exhibit 4 ("MT Assignment"). SAE acknowledges that SAFELA has the right to assign that interest in MT and that SAE shall no longer have any interest in MT as a result of the MT Assignment. SAE and SAFELA acknowledge and agree that as a result of the assignment of MT to Palm, neither shall have any interest in or claim against MT.

6.      **No Claims by SAE and SAFELA.** SAE and SAFELA acknowledge and agree that they have no claim against or interest in New Moon Pictures, LLC, a Louisiana limited liability company ("New Moon") or Seven Arts Pictures Louisiana, LLC, a Louisiana limited liability company, ("SAPLA")

7.      **Representations and Warranties.** Palm, SAE and SAFELA hereby represent and warrant as follows:

        a)      The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby: (i) have been duly authorized by

LOAN WORKOUT AGREEMENT - 2

all requisite actions; (ii) have been approved or consented to by all of its constituent entities whose approval or consent is required to be obtained; (iii) do not require the approval or consent of any governmental authority having jurisdiction over any of the parties; (iv) do not and will not constitute a violation of, or default under, the governing instruments of any party or any applicable requirement of a governmental authority; and (v) will not be in contravention of any court or administrative order or ruling applicable to any of them or any agreement to which they may be a party.

8.    **Further Documentation.** SAE and SAFELA shall execute and deliver any and all documents, instruments or agreements that Palm deems appropriate in order to reflect the terms and conditions of this Agreement.

9.    **No Waivers.** The terms and conditions of this Agreement do not, except as specifically provided for herein, alter, waive or amend the provisions of the Autopsy Loan Documents, the 9MD Loan Documents or any other loan made by Palm.

10.    **Release.** SAE and SAFELA hereby expressly release Palm from any claims whatsoever either may have against Palm. SAE and SAFELA acknowledge that they have been advised by legal counsel, and that they are familiar with and specifically waive the benefit of the provisions of Section 1542 of the Civil Code of the State of California, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

11.    **Notice:** All notices and other communications hereunder shall be given to the parties hereto at the following addresses:

To Lender:                    Palm Finance Corporation
                              Attn: Dennis Lautzenheiser
                              233 Wilshire Blvd., Suite 200
                              Santa Monica, California 90401
                              amfc233@amarkfinancial.com

With copies to:               John F. Kurtz, Jr.
                              Hawley Troxell Ennis & Hawley LLP
                              877 Main Street, Suite 1000
                              P.O. Box 1617
                              Boise, Idaho 83701-1617
                              jkurtz@hawleytroxell.com

                              Steven C. Markoff
                              Palm Finance Corporation
                              233 Wilshire Blvd., Suite 200
                              Santa Monica, California 90401
                              scmarkoff@aol.com

LOAN WORKOUT AGREEMENT - 3

To SAE and SAFELA:    Attn: Peter Hoffman
General Counsel
Seven Arts Entertainment, Inc.
8721 Sunset Blvd., Suite 209
Los Angeles, California 90060

All such notices, requests, demands and communications made in connection with the terms and provisions hereof shall be deemed to have been given or made on the day on which delivered or, if sent by registered or certified mail, postage prepaid and addressed as specified in this Section, on the third business day after the day on which it was mailed.

12.    **Governing Law, Venue and Attorney Fees.** This Agreement shall be deemed to be a contract under the laws of the State of California and for all purposes shall be governed by and construed and enforced in accordance with the laws of the State of California that are applied to contracts entered into and to be performed in that State. The parties to this Agreement acknowledge and agree that the venue of any action brought with regard to this Agreement shall be exclusively within the County of Los Angeles, State of California and that each party submits to the jurisdiction of the state and federal courts therein. The prevailing party in any litigation relating to this Agreement shall be entitled to an award of reasonable attorney fees and costs, including reasonable attorney fees and costs for an appeal.

13.    **No Third Party Beneficiaries.** This Agreement is made and entered into solely for the benefit of the SAE, SAFELA and Palm. Nothing contained in this Agreement shall in any way affect Palm's rights with respect to any person or entity not a party to this Agreement.

14.    **Successors and Assigns.** The rights of Palm hereunder shall inure to the benefit of its successors, participants and assigns and be binding upon the other parties to this Agreement as well as their respective successors and assigns. SAE and SAFELA may not assign any interest under this Agreement without the prior written consent of Palm, which may be withheld in its sole discretion.

15.    **Integration.** This Agreement is intended by the parties to be the final expression of their agreement with respect to the matters included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement. The parties intend that this Agreement shall constitute the complete and exclusive statement of its terms and no extrinsic evidence whatsoever may be introduced at any judicial proceeding regarding this Agreement.

16.    **Amendments.** No modification, waiver, amendment or discharge of this Agreement shall be valid unless the same is in writing and signed by the party against whom the enforcement of such modification, waiver, amendment or discharge is sought.

17.    **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same instrument. One or more counterparts of this Agreement may be delivered by facsimile or eye-readable electronic transmission with the intent that it or they will constitute an original counterpart hereof.

LOAN WORKOUT AGREEMENT - 4

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date of this Agreement.

SEVEN ARTS PICTURES, INC., a Nevada corporation

By: _____
    Name: Peter Hoffman
    Title: General Counsel

SEVEN ARTS FILMED ENTERTAINMENT LOUISIANA, LLC, a Louisiana limited liability company

By: _____
    Name: Peter Hoffman
    Title: General Counsel

PALM FINANCE CORPORATION

By: _____
Name: Dennis Lautzenheiser
Title: Vice President

LOAN WORKOUT AGREEMENT - 5

## ASSIGNMENT AGREEMENT

This Assignment Agreement ("**Agreement**") is made and entered into as of this 28th day of August 2014 ("**Effective Date**"), by and between: (i) PALM FINANCE CORPORATION, a California corporation ("**Palm**"); (ii) SEVEN ARTS ENTERTAINMENT, INC., a Nevada corporation ("**SAE**") and (iii) SEVEN ARTS FILMED ENTERTAINMENT LOUISIANA, LLC, a Louisiana limited liability company ("**SAFELA**"), with reference to the following:

## RECITALS

The following provisions form the basis for, and are hereby made part of, this Agreement:

A.      SAE, SAFELA and Palm are entering into a Loan Workout Agreement as of the Effective Date of this Agreement pursuant to which Palm is agreeing to release SAE from liability for a loan made by Palm to Pool Boy the Movie, LLC and Autopsy, LLC ( collectively "**Autopsy Borrowers**") pursuant to a Loan Agreement dated as of May 7, 2007 in which Palm agreed to make a loan to Autopsy Borrowers in the maximum principal amount of $5,500,000 ("**Autopsy Loan**") and for a loan made by Palm to Gone to Hell Limited ("**9MD Borrower**") pursuant to a Loan Agreement dated as of December 17, 2007 in the maximum principal amount of $4,000,000 ("**9MD Loan**") in connection with the production of a feature film currently entitled "Nine Miles Down" ("**9MD Film**").  SAE guaranteed both the Autopsy Loan and the 9MD Loan.

B.      The balance of the Autopsy Loan owed to Palm that was guaranteed by SAE as of August 15, 2014 is $5,029,987.97 and balance of the 9MD Loan that was guaranteed by SAE as of August 15, 2014 is $3,105,251.01, with interest accruing thereafter on each of those loans.

C.      At all relevant times to this Agreement, SAE has owned a sixty percent (60%) membership interest in SAFELA.

D.      As of October 1, 2013, SAFELA and SAE entered into the Multi-Picture Distribution Agreement attached hereto as Exhibit A.

E.      As of October 1, 2013, SAFELA and SAE entered into the Assignment attached hereto as Exhibit B pursuant to which SAE assigned to SAFELA all of its rights in the motion picture properties entitled "**Neuromancer**," "**Winter Queen**," "**Romeo Spy**," and "**Galahad**."

F.      One of the conditions of the Loan Workout Agreement and the release of SAE from liability pursuant to SAE's guaranties of the Autopsy Loan and the 9MD Loan is that SAE and SAFELA enter into this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, Palm, SAE and SAFELA agree as follows:

ASSIGNMENT AGREEMENT - 1

**Exhibit 1**

1.     **Assignment of Interests in Movie Properties by SAE to Palm.** SAE does hereby assign to Palm and its successors and assigns, in perpetuity, all rights of any nature or kind owned by SAE in the Multi-Picture Distribution Agreement dated as of October 1, 2013 between SAFELA and SAE, a copy of which is attached to this Agreement as Exhibit A, and all other rights of any nature or kind owned by SAE in the motion pictures described in Schedule "A" attached to the Multi-Picture Distribution Agreement. As further evidence of the assignment of those interests, SAE shall execute a form of Motion Picture Assignment Agreement attached hereto as Exhibit C. SAFELA shall have the right to continue to distribute the Movie Properties in accordance with the terms of the Multi-Picture Distribution Agreement in accordance with the terms of this Agreement.

2.     **Assignment of Movie Properties by SAFELA to Palm.** SAFELA does hereby assign to Palm and its successors and assigns, in perpetuity, all rights of any nature or kind owned by SAFELA in the motion pictures described in the Assignment attached to this Agreement as Exhibit B and the movie property entitled "**Thomasina**," (collectively "**Development Motion Pictures**"). As further evidence of the assignment of the Development Motion Pictures, SAFELA shall execute a form of Development Motion Picture Assignment Agreement attached hereto as Exhibit D.

3.     **SAFELA's Distribution Rights in Movie Properties.** SAFELA shall retain the right to distribute the movie properties described in the Multi-Picture Distribution Agreement attached to this Agreement in accordance with the terms of the Motion Picture Assignment Agreement attached hereto as Exhibit C and to produce and distribute or otherwise exploit the Development Motion Pictures in accordance with the terms of the Development Motion Picture Agreement, provided that SAFELA pays Palm 60% of all gross revenues received by SAFELA from the Movie Properties and the Development Movie Properties, which payments shall be made within 15 days of the end of each calendar month. Furthermore, if Palm has not received payments equal to the greater of: (1) 60% of all gross revenues received by SAFELA from the Movie Properties and the Development Movie Properties, or (2) a minimum payment of $75,000, within thirty (30) days after the end of each one year period from the date of this Agreement, the Multi-Picture Distribution Agreement shall be terminated and SAFELA shall no longer retain any interest in any of the Movie Properties or the Development Movie Properties, including any right to produce, distribute or exploit any of the Development Movie Properties.

4.     **SAFELA Reporting Requirements.** SAFELA shall provide Palm with a monthly written report in a form acceptable to Palm within 10 days of the end of each calendar month as long as SAFELA retains any interest in the Movie Properties. The written report shall describe the activities of SAFELA related to the Movie Properties and the revenue received by SAFELA during the previous calendar month. SAFELA shall further provide Palm with a detailed list and copies of each and every agreement entered into by SAE or SAFELA related to the Movie Properties within ten (10) business days from the date of this Agreement. SAFELA shall provide Palm with a copy of each and every agreement entered by SAFELA after the date of this Agreement within five (5) business days of entering into each such agreement. The failure to comply with the terms of this Section shall constitute a material breach of this Agreement, which shall allow Palm to terminate all of SAFELA's rights in the Movie Properties and the Development Movie Properties, by providing written notice to SAFELA of that termination.

ASSIGNMENT AGREEMENT - 2

5.      **Mortgages of Copyright.** SAFELA shall execute a Mortgage of Copyright to Palm, in a form acceptable to Palm, in each of the Movie Properties requested by Palm.

6.      **Quitclaim of Additional Movie Properties.** SAE and SAFELA will quitclaim their interests in all other movie properties as to which they may have had a previous affiliation to Palm in the form of agreement attached hereto as Exhibit E.

7.      **Representations and Warranties.** SAE and SAFELA hereby represent and warrant as follows:

        a)      SAE and SAFELA have not transferred any of their rights, titles or interests in the Movie Properties other than the assignments described in Exhibits A and B and as described in the detailed list and copies of agreements provided by SAFELA to Palm pursuant to Section 4 of this Agreement.

        b)      SAE and SAFELA and each and every entity in which they have an interest have no claims or rights against Seven Arts Pictures Louisiana, a Louisiana limited liability company ("**SAPLA**"), 807 Esplanade Ave. MT, LLC, a Louisiana limited liability or New Moon Pictures, LLC.

        c)      The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby: (i) have been duly authorized by all requisite actions; (ii) have been approved or consented to by all of its constituent entities whose approval or consent is required to be obtained; (iii) do not require the approval or consent of any governmental authority having jurisdiction over any of the parties; (iv) do not and will not constitute a violation of, or default under, the governing instruments of any party or any applicable requirement of a governmental authority; and (v) will not be in contravention of any court or administrative order or ruling applicable to SAE and SAFELA or of any agreement in which they are a party.

8.      **Further Documentation.** SAE and SAFELA shall execute and deliver any and all documents, instruments or agreements that Palm deems appropriate in order to reflect the terms and conditions of this Agreement.

9.      **No Waivers.** The terms and conditions of this Agreement do not, except as specifically provided for herein, alter, waive or amend the provisions of the Autopsy Loan Documents, the 9MD Loan Documents or any other loan to which Palm is a party and shall not constitute a waiver of any rights or remedies of Palm under those agreements at law or in equity.

ASSIGNMENT AGREEMENT - 3



10.    **Notice:**  All notices and other communications hereunder shall be given to the parties hereto at the following addresses:

To Palm:

Palm Finance Corporation
Attn:  Dennis Lautzenheiser
233 Wilshire Blvd., Suite 200
Santa Monica, California 90401
amfc233@amarkfinancial.com

With copies to:

John F. Kurtz, Jr.
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, Idaho 83701-1617
jkurtz@hawleytroxell.com

Steven C. Markoff
Palm Finance Corporation
233 Wilshire Blvd., Suite 200
Santa Monica, California 90401
scmarkoff@aol.com

To SAE and SAFELA:

Attn: Peter Hoffman
General Counsel
Seven Arts Entertainment, Inc.
8721 Sunset Blvd., Suite 209
Los Angeles, California 90060

All such notices, requests, demands and communications made in connection with the terms and provisions hereof shall be deemed to have been given or made on the day on which delivered or, if sent by registered or certified mail, postage prepaid and addressed as specified in this Section, on the third business day after the day on which it was mailed.

11.    **Governing Law, Venue and Attorney Fees.**  This Agreement shall be deemed to be a contract under the laws of the State of California and for all purposes shall be governed by and construed and enforced in accordance with the laws of the State of California that are applied to contracts entered into and to be performed in that State.  The parties to this Agreement acknowledge and agree that the venue of any action brought with regard to this Agreement shall be exclusively within the County of Los Angeles, State of California and that each party to this Agreement submits to the jurisdiction of the state and federal courts therein. The prevailing party in any litigation relating to this Agreement shall be entitled to an award of reasonable attorney fees and costs, including reasonable attorney fees and costs for an appeal.

12.    **No Third Party Beneficiaries.**  This Agreement is made and entered into solely for the benefit of the parties to this Agreement. Nothing contained in this Agreement shall in any way affect Palm's rights with respect to any person or entity not a party to this Agreement.

ASSIGNMENT AGREEMENT - 4



13. **Successors and Assigns.** The rights of Palm hereunder shall inure to the benefit of its successors, participants and assigns and be binding upon the other parties to this Agreement as well as their respective successors and assigns. SAE and SAFELA may not assign any interest under this Agreement without the prior written consent of Palm, which may be withheld in its sole discretion.

14. **Integration.** This Agreement is intended by SAE, SAFELA and Palm to be the final expression of their agreement with respect to the matters included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement. The parties intend that this Agreement shall constitute the complete and exclusive statement of its terms and no extrinsic evidence whatsoever may be introduced at any judicial proceeding regarding this Agreement.

15. **Amendments.** No modification, waiver, amendment or discharge of this Agreement shall be valid unless the same is in writing and signed by the party against whom the enforcement of such modification, waiver, amendment or discharge is sought.

16. **Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute one and the same instrument. One or more counterparts of this Agreement may be delivered by facsimile or eye-readable electronic transmission with the intent that it or they will constitute an original counterpart hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date of this Agreement.

**SEVEN ARTS ENTERTAINMENT INC.,**
a Nevada corporation

**SEVEN ARTS FILMED
ENTERTAINMENT LOUISIANA, LLC,**
a Louisiana limited liability company

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**PALM FINANCE CORPORATION**

By: _____
Name: Dennis Lautzenheiser
Title: Vice President

ASSIGNMENT AGREEMENT - 5

# MULTI-PICTURE
## DISTRIBUTION AGREEMENT

**THIS DISTRIBUTION AGREEMENT** (the "Agreement") is dated as of October 1, 2013 between SEVEN ARTS FILMED ENTERTAINMENT LOUISIANA LLC, a Louisiana limited liability company (the "Distributor") and SEVEN ARTS ENTERTAINMENT INC. (the "Owner"), a corporation organized pursuant to the laws of Nevada.

### WHEREAS:

1. The Owner has acquired all distribution rights to the list of motion pictures listed on Schedule "A" (collectively referred to herein as the "Picture").

2. The Owner wishes to grant the Distributor the exclusive right to exhibit, distribute and otherwise exploit the Picture in the Territory on the terms and conditions hereinafter set forth.

3. The Distributor wishes to exhibit, distribute and otherwise exploit the Picture in the Territory on the terms and conditions hereinafter set forth.

4. All terms herein shall have the meanings described herein or on Exhibit "3."

**NOW THEREFORE** in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1

### GRANT OF RIGHTS

1.1    **Grant of Rights.** The Owner hereby grants to the Distributor the following rights ("the Rights") to exhibit, exploit and distribute the Picture in the Territory and throughout the Term: Theatrical Rights, Non-Theatrical Rights, Television Rights, Home-Video Rights, all incidental Rights in and to any of the foregoing Rights, as well as any Derivative Rights, Music Rights, Phonorecord Rights, Merchandising Rights, or Publishing Rights.

## ARTICLE 2

### DELIVERY AND CREDITS

2.1    **Credits.** The Distributor shall comply with the Owner's written instructions to credits to be accorded on the screen or in any paid advertising and publicity issued by the Distributor or under the Distributor's control, and shall provide in its agreements with sub-distributors and licensees that such sub-distributor and/or licensee shall also comply therewith and shall include the same provisions in any agreements entered into by such sub-distributor with

SAFELA-SAE Distribution Agreement


**Exhibit A**



its sub-distributor(s), if any, provided that such written instructions have been approved in advance and in writing by the Distributor. This undertaking by the Distributor is solely for the benefit of the Owner and not for the benefit of any third party. No casual or inadvertent failure to comply with contractual obligations as to credits to be accorded on the screen or in any paid advertising and publicity by the Distributor or any of its subsidiaries, affiliates, sub-distributors or licensees to comply with contractual obligations as to credits to be accorded on the screen or in any paid advertising and publicity shall constitute a breach of this Agreement. Upon Distributor's receipt of notice from the Owner that the Distributor or its subsidiaries have failed to comply with the credits furnished to the Distributor by the Owner, the Distributor shall take all such steps as are reasonably practical to cure such failure with respect to future screen credits, advertising and publication, provided the credits accorded by the Owner conform to the provisions of this section. In the event that such failure was casual or inadvertent, there shall be no other remedy available to any person against the Distributor, its subsidiaries, affiliates, sub-distributors or licensees for any such failure. In no event shall the Owner be entitled to seek or receive injunctive relief in connection with any failure by the Distributor to comply with the provisions of this Section. In no event shall the Distributor be liable or have any responsibility for any acts or omissions with respect to credits created by or under the control of an exhibitor, newspaper, magazine, broadcaster or other parties who are not subsidiaries of the Distributor.

2.2    **Delivery.** The Picture shall be delivered to the Distributor in accordance with a delivery schedule approved by the Distributor, but in no event later than December 31, 2013 (the "Expected Delivery Date"). However, the Expected Delivery Date may be extended for up to a period up to 90 days at the Owner's option. Delivery of the Picture shall be accompanied by delivery to the Distributor of the materials set forth on Exhibit "I" hereto prepared in accordance with the specific Delivery Requirements contained in this Agreement.

## ARTICLE 3

## TERM

3.1    **Initial Term.** The initial term (the "Initial Term") of license granted in this Agreement shall be 25 years from the date hereof.

3.2    **Extensions.** This Agreement shall be automatically renewed for two further periods of 25 years and 45 years (the "Second and Third Terms", respectively), unless notice of termination is delivered to the Owner by the Distributor between six months and three months prior to the expiration of the Initial Term or the Second Term, as the case may be.

3.3    **Right of First Negotiation /Last Refusal After the Term has expired:**

(a)    If the Owner proposes to sell, license or otherwise exploit any Rights granted to the Distributor hereunder, the Owner shall first give the Distributor notice thereof.  The distributor shall have the exclusive right to negotiate in good faith with the intention of reaching an agreement to acquire the applicable Rights specified in the Notice, for a period of 60 days after receipt of the Notice. The parties agree that the first negotiation/last refusal rights set out herein are material and that damages are an inadequate remedy for any violation of any such



Rights. Therefore, the Distributor shall be entitled to equitable relief to prevent a breach of or to mandate compliance with its first negotiation/last refusal rights granted herein. If the Distributor and the Owner do not reach an agreement as to the material terms for an agreement to acquire such Rights within the 60 day period, the Owner may negotiate with third parties with respect to such Rights, subject to the provisions of Subsection 3.3 (b) below.

(b)   If the Owner makes or receives a bona fide offer with respect to the applicable Rights, the material terms of which are less favorable than the last offer made by the Distributor, and if the Owner proposes to accept such offer, the Owner shall give Notice to the Distributor of the material terms and conditions of the third party offer and the name of the person making the offer. The Distributor shall have the right to acquire the interest in the applicable Rights on the same material terms and conditions as the third party offer by giving Notice of acceptance thereof within 15 days after the Notice Date. Otherwise, the Owner shall be free to accept the third party offer. However, if the proposed third party transaction is not consummated, the Distributor's first negotiation/last refusal rights under this Section 3.3 will apply to each further offer relating to the applicable Rights of the Owner.

## ARTICLE 4

## PAYMENTS

4.1   **Net Receipts Participation:**

100% of Net Receipts as defined on Exhibit "2" attached hereto. Distributor may deduct any participations and residuals due to third parties providing services in connection with the Picture from Gross Receipts and pay such sums on behalf of Owner to the parties to which such sums are due under agreements entered into by Owner.

4.2   **Security Interest.** As security for the full and timely payment and performance of Owner's obligations hereunder, the Owner hereby grants to Distributor a security interest, charge and lien upon: (i) all of Owner's rights and interest in the Rights licensed hereunder; (ii) all of Owner's rights and interest as lessor or licensor under each of the Sub-Distribution Agreements, including without limitation, Distributor's right to payment and all payments there under, and (iii) any and all other rights and interest of Owner in, to and in connection with the Picture, now or hereafter acquired, including without limitation, all tangible and intangible assets, contracts, instruments, chattel paper, accounts, deposit accounts, cash, rights to payment, inventory, rights under copyright, and any and all proceeds, substitutions or replacements of any of the foregoing (collectively the "Owner's Collateral").

## ARTICLE 5

## DISTRIBUTION POLICY

5.1   **General.** With respect to the Rights, the Distributor shall have the broadest possible latitude in the exploitation thereof, and the exercise of its judgment in all matters pertaining thereto shall be final. In this connection, the Distributor shall have complete authority



to exploit the Rights in accordance with such sales methods, policies and terms as it may, in its sole discretion, determine; provided that it shall employ its reasonable best efforts to maximize the commercial benefits to the Owner from the exploitation of the Picture. Subject to the foregoing, the Distributor has not made any express or implied representation, warranty, guarantee or agreement as to the total amount of proceeds which will be derived from the exploitation of the Rights, nor has the Distributor made any express or implied representation, warranty, guarantee or agreement that there will be any sums payable to the Group hereunder or that the Rights will be exploited continuously. All matters relating to the exploitation of the Rights (including the scope and duration thereof) shall be decided by the Distributor in its sole discretion. In no event shall the Distributor incur any liability based upon any claim by the Owner that the Distributor has failed to realize receipts or revenue which should or could have been realized. The Distributor may settle, compromise, adjust, cancel, waive, give allowances to, not collect or not seek any remedy for collection of any contracts, debts or sums due with respect to any Rights, for any reason whatsoever.

5.2     **Sub-Distributors.**  Subject to the terms hereof, the Distributor may exploit the Rights either itself or through such other parties, including Affiliates of the Distributor, as the Distributor may, in its sole discretion, determine and, without limiting the foregoing, shall have the express right to enter into sub-distribution and licensing agreements which may extend beyond the Term of this Agreement. The Distributor may license the Rights connected therewith, in whole or in part, in good faith as may be consistent with the Distributor's general practice in such matters, to any and all other agencies in which the Distributor or its Affiliates may have an interest directly or indirectly upon such terms and rentals as the Distributor may deem fair and proper under the circumstances, and which are on arms-length, customary terms in the motion picture industry.

## ARTICLE 6

## REPRESENTATIONS, WARRANTIES AND COVENANTS

6.1     **The Owner's Warranties.** The Owner hereby warrants, represents and covenants as follows:

(a)     Owner is a limited liability company.

(b)     Owner has full power, right and authority to execute, deliver and fully perform this Agreement, and the execution, delivery and performance of this Agreement by the Owner has been duly authorized and this Agreement will be binding upon the Owner upon its execution.

(c)     Owner owns or will own all of the Rights, and has not previously assigned, licensed or transferred in any way any of the Rights.

(d)     There are, and will be, no claims, liens, encumbrances, limitations, restrictions or rights of the nature (including, without limitation, any liens or security interests in favor of any bank or other third party which may provide production financing for the Picture or may have



otherwise loaned money to the Owner or any other producer of the Picture ["Financier"]) in or to the Picture or any part thereof, except in favor of any Financier, or unless first expressly approved by the Distributor in writing, excluding only any liens which as a standard practice in the industry are required to be entered into in favor of any collective bargaining entity   in connection with the Picture, and then only if such entity enters into a standard subordination agreement with respect to such lien subordinating its security interest in and to the Rights.

(e)    The Owner has, or will have, as of the date of Delivery of the Picture, fully paid, satisfied, cured or discharged at the time due or required all of the following:

i)    all claims and rights of any person in respect of copyrights in literary, dramatic, musical rights and other property or rights in or to all stories, plays, scripts, scenarios, themes, incidents, plots, characters, dialogue, music, words and other material of any nature whatsoever appearing, used or recorded in the Picture;

ii)    all claims and rights of any person in respect of inventions and patent rights with respect to the recording of any and all dialogue, music and other sound effects recorded in the Picture and with respect to the use of all equipment, apparatus, appliances and other materials used in the photographing, recording or otherwise in the manufacture of the Picture;

iii)    all claims and rights with respect to the use, distribution, performance, exhibition and exploitation of the Picture, and any music contained therein;

iv)    all costs of producing and completing the Picture, including, without limitation, any and all compensation including residuals (to the extent only that residuals payable in connection herewith are then due and payable), pension and welfare benefits and other payments required by applicable guild or union agreements, due or which may become due to any actors, musicians, directors, writers or others who participated in the Picture;

v)    any liens, claims, charges, encumbrances, restrictions, agreements, commitments or arrangements whatsoever with any person, firm or corporation, or any obligation then due and payable and all defaults under, or breaches of, any contract, license or agreement which could, or would, in any way interfere with, impair, abrogate or adversely or otherwise affect any of the Rights granted to the Distributor hereunder; and

vi)    any other payments of any kind required to be made in respect, or as a result of any use of the Picture, except to the extent expressly required to be defrayed by the Distributor hereunder.

(f)    None of the Picture, nor any parts thereof, nor any materials contained therein or synchronized therewith, nor the titles thereof, nor the exercise by the Distributor of any right,



license or privilege respecting the Picture, violates or will violate, or infringes or will infringe, any trademark, trade name, contract, agreement, copyright (whether common law or statutory), patent, literary, artistic, dramatic, personal, private, civil or property right or right of privacy or "moral rights of authors" or any other right whatsoever of, or slanders or libels, any person, firm, corporation or association whatsoever.

(g)     The Owner owns and controls, or prior to Delivery of the Picture hereunder will own or control, without any limitations or restrictions whatsoever, except as expressly approved by the Distributor in writing, all motion picture, performance and all other Rights in and to the Picture and all the soundtracks thereof, and has obtained or will obtain all necessary licenses required for the production, synchronization, exhibition, performance, distribution, marketing and exploitation of the Picture (including the music contained therein, subject only to the payment of such performing fees, if any, as are customarily payable by exhibitors to such performing rights society as shall have jurisdiction) for any and all purposes and for every means, method and device now or hereafter known or required for the full, complete and unlimited exercise and enjoyment by the Distributor of each and all of the Rights.

(h)     The performing rights to all musical compositions contained in the Picture are, or will be prior to Delivery, (i) controlled by the ASCAP, BMI or their Affiliates, or (ii) in the public domain, or (iii) owned or controlled by the Owner.

(i)     The copyright in the Picture is and will be valid and subsisting at all times hereafter and no part thereof (excluding music), is in the public domain, except for stock or re-used film and except as expressly approved by the Distributor in writing. All material upon which the Picture is based or which is contained in the Picture is either (i) owned by the Owner, (ii) properly licensed to the Owner, or (iii) in the public domain.

(j)     The main and end titles of the negative and pre-print materials of the Picture contain, or will contain, on Delivery:

i)     A copyright notice in the form complying with the United States Copyright Revision Act of 1976, as amended, and the Universal Copyright Convention, with the phrase "All Rights Reserved ";

ii)     The following legend shall appear in accordance with the Distributor's customary practice (i.e., located in the end titled at or near the cast of characters):

"THIS MOTION PICTURE IS PROTECTED UNDER THE LAWS OF CANADA AND THE UNITED STATES OF AMERICA AND OTHER COUNTRIES. UNAUTHORIZED DUPLICATION, DISTRIBUTION OR EXHIBITION MAY RESULT IN CIVIL LIABILITY AND CRIMINAL PROSECUTION"; and

iii)     All necessary and proper credits for the actors, directors, writers and all other persons appearing in or in connection with the production of the Picture who are entitled to receive the same. The Distributor shall have the right to designate



the form of, and to receive, credit in connection with the rights granted herein (including, without limitation, a distributor's credit and a so-called "presentation" credit), all subject to the credit obligations of Owner.

(k)     All information provided to the Distributor by the Owner as required by this Agreement shall at the time provided and continuously thereafter be true, correct and complete.

(l)     The Distributor will quietly and peacefully enjoy and possess each and all of the Rights, licenses and privileges in the Picture herein granted or purported to be granted to it without interference or hindrance by any person.

6.2     **Distributor's Representations, Warranties and Covenants.** The Distributor hereby represents, warrants and covenants to Owner as follows:

(a)     The Distributor is a corporation duly organized, validity existing and in     good legal standing under the laws of Nevada.

(b)     The Distributor has the legal power, right and authority to enter into this Agreement and to consummate the transactions contemplated hereby, The officers executing this Agreement and any agreement contemplated by this Agreement have the legal power, right and actual authority to bind the Distributor to the terms and conditions hereof and thereof. This Agreement constitutes the legal, valid and binding agreement of the Distributor, enforceable in accordance with its terms.

(c)     There are no suits, actions, arbitrations, or legal, administrative or other proceedings, or governmental investigations pending or, to the best knowledge of the Distributor, threatened, against the Distributor.

6.3     **Indemnity.** Distributor and Owner (in this capacity "Indemnitor") do hereby and shall at all times indemnify and hold harmless the other parties, their successors and assignees, and all officers, directors, agents, attorneys and employees of the foregoing (herein collectively referred to as "Indemnitees") from and against any and all costs, claims, charges, recoveries, losses, expenses (including, but not limited to, attorneys' fees and disbursements), liabilities, damages, judgments, settlements, injunctions, compromises, penalties, decrees or any other loss of any kind or nature whatsoever (all referred to herein as "Loss") which may be made, asserted, maintained or secured against, or suffered by, any Indemnitee caused by or arising out of any breach by the Indemnitor of any of its representations warranties herein, including, without limitation, any consequential or special damages proximately caused by the foregoing. Indemnitees agree to give Notice to the Indemnitor of any claim, demand or action which is or may be subject to this section ("Claim") promptly after obtaining knowledge thereof and shall on request make available to the Indemnitor all documents relating to the Claim. Failure to give Notice shall not affect the right of any Indemnitee to indemnification herein if the Indemnitee can establish that the Indemnitor is not prejudiced by such failure. Promptly upon receipt of such Notice or upon obtaining knowledge of any Claim, the Indemnitor agrees to assume the defense of the Claim on behalf of itself and Indemnitees at the sole cost of the Indemnitor. The Indemnitees or each of them shall have the right to participate in the defense of any Claim



through counsel of their choice at their own expense. If the Indemnitor fails to promptly assume the defense of any Claim, the Indemnitees or any of them may do so and the Indemnitor shall promptly reimburse the Indemnitees for all costs and expenses (including, but not limited to attorney's fees and disbursements) incurred in connection therewith as such are incurred; in such case the Indemnitees shall not settle or compromise any Claim without the Consent of the Indemnitor, such Consent not to be unreasonably withheld. If the Indemnitor shall fail to so reimburse the Indemnitees, then, without waiving their rights otherwise to enforce such reimbursement, the Indemnitor shall, on behalf of the Indemnitees, have the right to deduct the said amount of such payments, costs and expenses, or any part thereof, from any sums accruing to or for the account of the Indemnitor under this Agreement.

## ARTICLE 7

## TERMINATION, DEFAULTS

7.1    **Limitations.** This Agreement may not be terminated, revoked, cancelled, rescinded or otherwise abrogated for any reason whatsoever prior to the expiration of the Term, without the Consent of Distributor.

7.2    **Effect on Existing Agreements.** Notwithstanding any other provision of this Agreement, with respect to any sub-distribution or licensing agreements or any assignments entered into by the Distributor in connection with the Rights ("Sub-Distribution Agreements"), the following shall apply:

(a)    any termination, expiration, revocation, cancellation, rescission, repudiation, abrogation or failure of any aspect of this Agreement, occurring for any reason whatsoever, shall so far as the Owner is concerned be subject to and shall in no way affect any Sub-Distribution Agreements, regardless of (*inter alia*) the length of the remaining term of any such Sub-Distribution Agreements;

(b)    the Owner shall do nothing to disturb or interfere in any way with any rights under the Sub-Distribution Agreements; and in connection with the foregoing, at the end of the Term of this Agreement, any agreements entered into, or Rights granted, prior thereto by the Distributor in the exercise of its Rights under this Agreement (or by any of its sub-distributors or licensees in the exercise of the Rights granted to them by the Distributor), which have not by their terms terminated or expired, shall remain in effect and the Group shall succeed to the Distributor's position thereunder;

(c)    all sales, assignments, pledges, encumbrances or other transfers of any nature whatsoever, made at any time whatsoever by, on behalf of or under the authority of the Owner of all or any part of the Owner's rights in the Picture, shall be subject to all such Sub-Distribution Agreements; and

(d)    if by operation of law or otherwise any rights in such Sub-Distribution Agreements revest in or revert to the Owner, then the Owner will grant to such persons as the Distributor may designate effective immediately upon any such revesting or reverting all such



rights under the affected Sub-Distribution Agreements as necessary, appropriate or convenient in the Distributor's sole discretion, and the Owner hereby irrevocably appoints the Distributor as the Owner's exclusive attorney-in-fact, for its use and benefit, with full power of delegation, substitution and re-substitution, for the purpose of executing, acknowledging, filing and recording any and all documents and instruments and doing all other acts necessary or advisable to further accomplish the purposes aforesaid, this power of attorney to survive the dissolution, bankruptcy or other legal incapacity of the Owner.

7.3     Events of Default - Distributor.

An "Event of Default" by the Distributor shall mean the occurrence of any of the following events.

(a)     The breach or failure of the Distributor to keep or perform any  agreement or obligation or any representation or warranty of the Distributor made under this Agreement, and is confirmed by a final judgment of a court of competent jurisdiction, if Distributor disputes any such claim of breach;

(b)     The making by the Distributor of any general arrangement or assignment for the benefit of its creditors;

(c)     The commencement of any bankruptcy, insolvency, reorganization or liquidation proceeding by or against the Distributor; or

(d)     The appointment of a conservator, trustee or receiver for the administration of the Distributor's financial affairs, or to take possession of substantially all of the Distributor's assets.

7.4     Cure Period. In the event of a breach or default by the Owner or by the Distributor, other than those breaches and defaults set forth as Events of Default in Sections 7.3 hereof, no such event shall be actionable at law or in equity unless and until:

(i)     The breaching party receives Notice of the event of breach or default from the other party; and

(ii)     The breaching party fails to cure the breach or default within 30 days of the Notice Date.

7.5     Remedies. All rights and remedies granted to either party under this Agreement are cumulative and the exercise of one shall not limit or affect that party's right concurrently or subsequently to exercise any other right or remedy, and shall be in addition to such other rights or remedies as that party may have at law, in equity, under this Agreement or otherwise. The Owner acknowledges and agrees that the rights granted to the Distributor hereunder are of a special, unique and extraordinary nature, the breach, loss or impairment of which would cause irreparable harm to the Distributor, and could not adequately be compensated for by money damages. Accordingly, in the event of any actual or anticipatory breach, loss or impairment of such rights, in addition to all other remedies which may be available to the Distributor, the



Distributor shall be entitled to injunctive relief against the Owner and against each and every one of its predecessors and successors and assigns with respect to the rights granted to the Distributor hereunder to prevent any such breach, loss or impairment. In no event shall the Owner be entitled to seek or obtain any injunctive relief with respect to the exercise by the Distributor of any Rights granted to the Distributor hereunder, it being agreed that the only remedy of the Owner shall be an action for an accounting or for damages, without limiting the Owner's rights pursuant to Section 7.3 hereof.

7.6    **Force Majeure.** Notwithstanding any other provisions of this Agreement, neither party shall be liable to the other in damages or otherwise because of any failure to perform hereunder caused by fire, earthquake, flood, epidemic, catastrophic accident, explosion, casualty, strike, lock-out, riot, civil disturbance, act of public enemy, embargo, war, act of God, by any municipal, state or federal ordinance or law, by any legally constituted authority, whether municipal, state or federal, by the issuance of any executive or judicial order, or the unavailability of the director or any principal cast member (which unavailability is beyond the reasonable control of the producer of the Picture and of the Distributor and which prevents production of the Picture; due to their death, incapacity or default of their agreements with the production entity that produces the relevant Picture (to the extent not covered by insurance). In no event shall inclement weather be deemed to be or considered as an event of force majeure for any purpose of this Agreement. If the distribution of the Picture shall be materially interrupted by any such cause, or if, for any reason whatsoever, the majority of the motion picture theatres in any country comprising the Territory exhibiting motion pictures shall be closed for one week or more, then at the election of the Distributor, the Distributor's obligations under this Agreement may be suspended with respect to such country in the Distributor's sole discretion for such time as such conditions may exist.

## ARTICLE 8

## LEGAL PROCEEDINGS

8.1    **Copyright Infringement.** If any person shall do or perform any acts which the Distributor believes constitute in the Territory a copyright infringement of the Picture or of any of the literary, dramatic or musical material contained in the Picture, or constitute a plagiarism, or violate or infringe any right of the Owner, the Distributor or any sub-distributor or licensee of the Distributor (as the case may be) or if any person shall do or perform any acts which the Distributor believes constitute an unauthorized or unlawful distribution, exhibition, or use thereof, then and in any such event, the Distributor (and any of its sub-distributors or licensees) may and shall have the exclusive right to take such steps and institute such suits or proceedings as the Distributor (or any of its sub-distributors or licensees) may deem advisable or necessary to prevent such acts and conduct and to secure damages and other relief by reason thereof, and to generally take such steps as may be advisable, necessary or proper for the full protection of the rights of such parties, and if the Distributor fails to take any such action, any one of the Owner or IDC may do so in the Distributor's name but at the sole expense of the prosecuting party. The name of the Owner, may be utilized to the extent permitted by law in any suits or proceedings which may be brought by the Distributor or its sub-distributors or licensees.



8.2     **Right to Defend.** If any claim shall be made against the Owner in respect of:

i)      the Picture,

ii)     any of the Rights granted to the Distributor hereunder, or

iii)    any matter for which the Distributor is required to indemnify the Owner hereunder,

the Owner undertakes to give notice to the Distributor of such claim, as promptly as is reasonably possible, and in no event later than fifteen (15) days after the Notice Date and the Distributor shall have the right to engage such legal representatives as it shall require in connection therewith and the exclusive right to control the defense, prosecution or settlement of the applicable claim (whether or not by the issuance of legal proceedings to the extent permitted by law), subject to the Owner being indemnified by the Distributor against any legal and other costs occasioned by the Owner in respect of such claim unless the Owner shall elect to participate in the applicable proceeding together with the Distributor through counsel of the Owner's choice.

8.3     **Further Assurances.** If the Distributor deems it necessary or appropriate to effectuate, confirm and protect any of its rights granted to it hereunder, the Owner agrees to promptly execute any documents and do any acts reasonably appropriate to confirm and effect such rights (specifically including those rights set forth in Article 7 and this Article hereof), and if the Owner shall fail to do so within two (2) business days after the Distributor's request, the Distributor shall have the right to execute such documents and perform such acts in the name of the Owner on its behalf but for the Distributor's benefit, and the Owner does hereby irrevocably appoint the Distributor as their attorney-in-fact (with full power of delegation, substitution and re-substitution) for such purposes.

## ARTICLE 9

## MISCELLANEOUS

9.1     **No Third Party Beneficiary.** Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any person other than the parties hereto (and in the case of Indemnities, any Indemnitee) any right, remedy or claim, legal or equitable, under or by reason of this Agreement or any provision hereof, this Agreement and all of its provisions being intended to be and being for the sole and exclusive benefit of the parties hereto.

9.2     **Waivers.** Any party may waive the benefit of any term, condition, warranty or covenant in this Agreement or any right or remedy at law or in equity but only by an instrument in writing signed by the party to be charged. The waiver of any breach of this Agreement or any right or remedy granted hereunder or at law or in equity shall not be deemed a waiver of any preceding or succeeding breach of the same or any other provisions hereof or of the opportunity to exercise such right or remedy at any preceding or subsequent time.



9.3 **Assignment.** The Distributor may not assign its rights and delegate its obligations under this Agreement to any person without the prior written Consent of the Owner, which Consent shall not be unreasonably withheld, unless to a person controlled by or under common control with Peter M. Hoffman. The Owner may not assign their rights or delegate their obligations without the prior written Consent of the Distributor, which Consent shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall endure to the benefit of and be binding upon the successors and assigns of each party.

9.4 **Amendments.** This Agreement may not be altered, modified, amended, cancelled, rescinded, discharged or terminated except as specifically herein provided or by an instrument in writing signed by both parties.

9.5 **Entire Agreement.** No person, whether or not an officer, agent, employee or representative of any party hereto, has made for or on behalf of that party any agreement, representation, warranty, statement, promise, arrangement or understanding ("Other Agreements") not expressly set forth in this Agreement. This Agreement and all agreements referred to herein constitute the entire agreement between the parties and supersede all prior or concurrent oral or written, express or implied Other Agreements with respect to the subject matter hereof. The parties acknowledge that in entering into this Agreement, they have not relied and will not in any manner rely upon any Other Agreements, other than those Agreements specifically set forth in this Agreement or in any agreements referred to therein.

9.6 **Governing Law.** This Agreement shall be deemed a contract made under and shall be construed and enforced and the legality and validity of each term and condition shall be determined in accordance with the laws of Louisiana and the parties hereto attorn to the jurisdiction of the courts of Louisiana.

9.7 **Captions.** Captions or paragraph headings are used herein for convenience of reference only, shall not constitute a part of this Agreement and shall not be utilized or referred to in the construction or interpretation of this Agreement.

9.8 **Currency.** Unless otherwise indicated, all references herein to any sum of money shall be deemed to be a reference to lawful currency of the United States of America and all sums or amounts payable hereunder shall be paid in such currency.

9.9 **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall constitute an original hereof and which together shall constitute one agreement.

9.10 **Notices.** All notices, approvals, requests or demands ("Notices") which any party is required or may desire to give to the other hereunder shall be in writing, unless otherwise specified, and shall be addressed to the address provided for herein. All Notices shall be given in one of the following ways:

(i) by delivery to the address set forth below for such party;



12

(ii)     by mail, registered or certified (return receipt requested), postage prepaid, airmail (if available); or

(iii)     by transmittal by any electronic means whether now known or hereafter developed, including but not limited to, telex, telecopier, or facsimile transmissions, able to be received by the party intended to receive notice. If so delivered, mailed, telegraphed, cabled, or transmitted, each Notice shall, except as herein expressly provided, be conclusively deemed to have been given when delivered, or when electronically transmitted, or on the fifth business day following the date of mailing, as the case may be. The addresses of the parties shall be those of which the other party actually receives written Notice and until further notice are:

To the Distributor:

Seven Arts Filmed Entertainment Louisiana LLC
807 Esplanade Avenue
New Orleans, LA 70116

To Owner:

Seven Arts Entertainment Inc.
8439 Sunset Boulevard
Suite 402
Los Angeles, CA 90069
Tel: 323-372-3080
Fax: 323-389-0664

     9.11    **Severability.** Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever any provision of this Agreement is held to be invalid or illegal under any material statute, law, ordinance, order or regulation, such provision shall be curtailed and limited only to the extent necessary to bring it within the legal requirements and such curtailment or limitation shall not affect the validity of the remainder of this Agreement or any other provisions hereof.

     9.12    **Time.** Time is of the essence with respect to this Agreement.

     9.13    **Name and Gender.** Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders, and the neuter gender shall include the masculine and feminine, as the context requires; and the words "person" or "party" shall include corporations, firms, Owner, or other forms of association.

     9.14    **Attorneys' Fees.** In any action, suit or proceedings brought by either party with respect to this Agreement, its subject matter or the actions, statements or conduct of the parties hereunder, the prevailing party shall be entitled to recover from the other party all costs and



expenses incurred in connection therewith, including but not limited to attorneys' fees, attorneys' costs and court costs.

9.15   **Further Assurances.** Each party shall execute and deliver such other documents or instrument as may be necessary or desirable to evidence, effectuate or confirm this Agreement, and any of the terms and conditions hereof.

9.16   **Not a Joint Venture or Sale.** Nothing herein contained shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other; and neither shall anything contained herein constitute a purchase or sale agreement. The parties hereby acknowledge that this Agreement constitutes a license of certain distribution rights as to the Picture and grant of certain ancillary rights and obligations in connection therewith. Neither party shall hold itself out contrary to the terms of this paragraph, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof.

9.17   **Definitions.** Unless otherwise defined, all capitalized terms shall have the meanings ascribed to them in Exhibit "4" hereof.

9.18   **Exhibits.** Each and every Exhibit attached hereto is incorporated herein by this reference as if set forth in full.

**IN WITNESS WHEREOF**, the parties have executed this Agreement effective as of the date first written above.

SEVEN ARTS ENTERTAINMENT INC.

By:

Kate Hoffman
Chief Executive Officer

SEVEN ARTS FILMED ENTERTAINMENT LOUISIANA LLC

By:

Peter M. Hoffman



LIST OF EXHIBITS
TO
INTERNATIONAL DISTRIBUTION AGREEMENT

EXHIBIT "A"          List of the Motion Pictures

EXHIBIT "1"          Delivery Requirements

EXHIBIT "2"          Entitlement Schedule and Certain Other Provisions

EXHIBIT "3"          Definitions



SCHEDULE "A"

The Pictures

A Broken Life
Autopsy
Back In The Day
Boo
Deal
Drunkboat
Knife Edge
Night of the Demons
Nine Miles Down
Noise
Pool Boys
Pool Hall Prophets aka Shooting Gallery
Schism



EXHIBIT "1"
TO
INTERNATIONAL DISTRIBUTION AGREEMENT

DELIVERY REQUIREMENTS

All elements below to apply to both the Film and the trailer of the Film.

## FILM DELIVERABLES

* Digital Cinema Package 16x9 full height anamorphic of the Feature –fully graded *(PHYSICAL DELIVERY)*
* Digital Cinema Package 4x3 full frame pan & scan of the Feature –fully graded *(PHYSICAL DELIVERY)*

## VIDEO / DVD ELEMENTS

* High Definition HD D5 16x9 full height anamorphic of the Feature –fully graded *(ACCESS ONLY)*
* High Definition HD D5 4x3 full frame pan & scan of the Feature –fully graded *(ACCESS ONLY)*
* International Video Master 4x3 full frame pan & scan of the Feature – One (1) PAL and one (1) NTSC Digital Betacam with full English mix in stereo on Channels 1 & 2 and fully synchronised stereo M & E on Channels 3 & 4. *(PHYSICAL DELIVERY)*
* International Video Master 16x 9 original aspect ratio of the Feature – One (1) PAL and one (1) NTSC Digital Betacam in the same aspect ratio as theatrical feature with full English mix in stereo on Channels 1 & 2 and fully synchronised stereo M & E on Channels 3 & 4. *(PHYSICAL DELIVERY)*
* International Video Master Textless Backgrounds – Either together with the above mentioned items, or separately, a first-class videotape in each of the identical formats as supplied above containing the textless backgrounds of the Main and End titles of the Picture as well as textless backgrounds for any other scenes over which subtitles, location titles, or other printing appears in the final version of the Picture. *(PHYSICAL DELIVERY)*
* Master Video Technical Evaluation - One copy of the final Master Video Technical Evaluation report as created by any pre-approved lab for each video master delivered. Should the evaluation prove that any of the master videotapes are not of acceptable quality, it is the Producer's responsibility to repair any faults listed on the evaluation report. *(PHYSICAL DELIVERY)*

## AUDIO ELEMENTS (PHYSICAL DELIVERY)

* DA88 FEATURE DM&E TRACK – Dialogue, Music & Effects of final soundtrack with separate stereo (6 tracks) running at 25fps to match video masters
* DA88 FEATURE (5.1 mix) – The final 6-track stereo digital Printmaster, with the tracks formatted Left, Left Surrounds, Center, Right Surrounds, Right & Boom in synch with the final Picture
* DA88 FEATURE (stereo mix) – The final 2-track stereo matrixed Printmaster (LTRT) in synch with the final Picture



- **DA88 FEATURE M&E (5.1)** –The final 6-track International music & effects soundtrack at 25FPS, 48KHz and 25EBU with the tracks formatted Left, Center, Right, Left Surround, Right Surround, Subwoofer, any additional information, dialogue guide in synch with the final Picture

- **DA88 FEATURE M&E (stereo)** – The final 4-track stereo Foreign Music and Effects master in a 6-track format (also referred to as the 4 + 2), with the first 4-tracks formatted as left, center, right & surrounds, track 5 used for any additional or miscellaneous information (i.e., commercials, song lyrics, foreign (exotic) language, etc.) and track 6 formatted with the mono version of the English dialogue guide track.

*

## DOCUMENTATION (PHYSICAL DELIVERY)

- **Music Cue Sheet** - in customary format giving full details of recordings, copyright owners, performers, composers, publishers, timings etc

- **Combined Action, Dialogue, Spotting & Continuity List** -with all final dialogue and scene descriptions and(spotting) timecode for subtitles of the finished Feature, Trailer and any available DVD Extras on CD-Rom in either Microsoft Word or Adobe Acrobat

- **Music /Stock Footage Licenses-** All agreements and other documents relating to music rights and stock footage usage which fully grant Distributor and its Third Party Distributors the right to exploit all music and stock footage embodied in the Picture delivered hereunder in every and all media, and every manner and all Territories in which the Picture may be exploited by Distributor or its Third Party Distributors and evidence of payment in full with respect to all such documents

- **On Screen & Paid Ad Credits-** Agreements (or certified credit excerpts therefrom) in connection with all personnel connected with the Picture who are entitled to screen and/or advertising credits, a separate statement summarizing all screen and advertising credits in such form and containing such information as Distributor may require, and a hard copy of the on-screen credits (main and end titled) and layout of the proposed paid ad credit billing block. Producer shall also provide a complete statement of all dubbing obligations (if any) and any other third party restrictions and approval rights (including, without limitation, director's editing rights, video mastering consultation or approval rights, etc.);

- **Billing Blocks** - Final approved billing blocks for posters, video packaging, paid advertising, sales materials and trailers, and camera ready black and white stats of all logos required to be included in billing block

- **Cast Contact Details** – A list of contact details for the agents, managers and/or publicists of the main cast

- **Chain Of Title** – A summary page outlining all Chain of Title documents, in chronological order, as well as all documents evidencing proof of ownership and all documents evidencing proof of payment in connection with any transfer of rights

- **E & O Insurance-** A copy of the E&O certificate which meets the requirements listed on Exhibit "A" attached hereto and incorporated herein by this reference

- **Copyright Certificate** - Clearly legible photostatic copies of the U.S. copyright registration certificate(s) for both the screenplay and Picture. If the U.S. copyright registration certificate for the Picture is not yet available at the time of delivery, a copy of the Form PA and evidence of submission and payment of deposit fees shall suffice until such time as the conformed certificate becomes available; whereupon, a clearly legible photostatic copy shall be immediately provided.

- **Completion Guarantee-** copy of certificate



- **MPAA Certificate** - A clearly legible photostatic copy of the fully paid rating certificate issued for the Picture and, if available, for the trailer of the Picture by the Classification and Rating Administration of the Motion Picture Association of America, evidencing a rating of not more restrictive than "R."

## PUBLICITY & MARKETING MATERIALS (PHYSICAL DELIVERY)

- **Photography**- Minimum of 75 colour high resolution digital images of cast, relevant groupings, production shots and individual shots of key cast, producer and director, all captioned and approved for use to be supplied on CD-Rom. Access to contact sheets and all negatives.
- **Press Kit** –The approved press kit, which shall include, without limitation, set of Production Notes, long and short synopsis, and biographies of key personnel to be provided on CD-Rom as a Microsoft Word document.
- **Key Art (layered)** - If available, original textless, layered full color key art used in the one-sheet poster, together with the correct advertising billing, title treatment and copylines for use in such one-sheets to be provided in (i) digital format and; (ii) a hard copy to verify accurate printing.
- **Electronic Press Kit (E.P.K.)** – If available, one (1) PAL and (1) NTSC of both a VHS and Digital Betacam of the EPK, "making of", clips, promos, trailer, b-roll, sound bites etc... *Preferably cleared for DVD use as well*
- **Advertising Materials** – If available, one (1) copy of all advertisements, paper accessories and other advertising materials, prepared by Producer or by any other party in connection with the Picture, including, but not limited to, samples of one-sheet posters and individual advertising art elements and transparencies necessary to make proofs thereof, VHS & Digital Betacam of any TV Spots, and DA-88 of any radio spots

In addition to the above materials, Licensor shall use all reasonable efforts promptly to deliver (or grant access) to Distributor, other materials reasonably requested by Distributor in relation to the Film or the trailer.

All materials hereunder shall be of first rate technical quality utilising up to date techniques and processes. Where materials contain information, such information shall be complete and accurate, and materials supplied as approved for use shall be fully cleared and available for Distributor's use.



## EXHIBIT "A"
### SEVEN ARTS PICTURES, INC. - E&O POLICY REQUIREMENTS

Use the following language to add our company as an additional insured:

"Seven Arts Pictures, Inc., its subsidiaries and all associated, affiliated and related entities, its successors, licensees, subdistributors and assigns and the officers, directors, agents and employees of each of the foregoing."

Please include the following language:

1.        Coverage is primary and not contributing to or in excess of any such insurance maintained by Seven Arts Pictures Inc..

2.        Policy does not contain any non-standard endorsements, exclusions or restrictions in coverage. (We need this on the policy, and if it's not stated on the policy, then we require a copy of the entire policy.)

3.        Policy shall not be cancelled without (30) days prior notice to Seven Arts Pictures Inc.

The insurance policy must be in place for at least three (3) years from the first day of the license period, with limits of no less than US$1,000,000 per claim and US$3,000,000 in the aggregate with a deductible of no more than US$10,000

Policy must include coverage for the title (and any a.k.a. name, if applicable) and coverage for the music

